IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00269-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JESSICA SHARMAN,

    Defendant.

---

# PLEA AGREEMENT

---

The United States of America (the government), by and through Anna Edgar, Assistant United States Attorney for the District of Colorado, and the defendant, Jessica Sharman, personally and by counsel, Thomas Ward, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I. AGREEMENT

This agreement is submitted to the Court for its consideration pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

**Defendant's Obligations**

The defendant agrees to waive her right to indictment and plead guilty to Count 1 of the Information, charging a violation of Title 18, United States Code, Section 1365(a), Tampering with a Consumer Product.

COURT EXHIBIT 1

The defendant is aware that Title 18, United States Code, Section 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 26; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under Title 28, United States Code, Section 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct. If the government appeals the sentence imposed by the Court in this case, the defendant is released from this waiver provision.

## Government's Obligations

Provided the defendant does nothing inconsistent with accepting responsibility between the date of her plea and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility.

In exchange for the defendant's cooperation in participating in proffer sessions and providing information regarding the circumstances of the offense, thereby allowing full disclosure on a matter involving the public health, the government agrees to recommend a variant sentence of not more than 44 months.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offense to which this plea is being tendered are as follows:

(1) With reckless disregard for and extreme indifference;

(2) To the risk that another person would be placed in danger of death or bodily injury;

(3) The defendant tampered with a consumer product or the container for such product, or attempted to do so; and

(4) The consumer product affected interstate or foreign commerce.

18 U.S.C. § 1365(a).

A "consumer product" is "any food, drug, device, or cosmetic, as those terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321."

3

18 U.S.C. § 1365(h)(1)(A). Fentanyl is a drug as defined by the FDCA. "Bodily injury" is defined to include "physical pain." 18 U.S.C. § 1365(h)(4).

### III. STATUTORY PENALTIES

The maximum statutory penalty for a violation of Title 18, United States Code, Section 1365(a)(4) is: not more than ten years imprisonment, not more than $250,000 fine, or both a fine and imprisonment; three years supervised release; a $100 Special Assessment fee; and restitution[1] as determined by the Court.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

### IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in Title 18, United States Code, Section 3553, additional facts may be

---

[1] The provisions of the Mandatory Victim Rights Act apply to the offense. See 18 U.S.C. 3663A(c)(1)(A)(iii).

4

included below that are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other Section 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is not later than February 2018.

The parties agree as follows:

The Defendant's Background and Position with the Hospital

Jessica Sharman received her Associate's Degree for Applied Science in Nursing from Morgan Community College in Fort Morgan, Colorado, in May 2009. Sharman obtained her license as a Registered Nurse from the State of Colorado in August 2009. Sharman worked as a nurse for various employers until she began working in the Intensive Care Unit at Parker Adventist Hospital ("Parker Adventist" or "the hospital") in January 2018.

At the time of the offense, Parker Adventist used Pyxis automated medication dispensing machines to store controlled substances including fentanyl. There were two Pyxis machines in the Intensive Care Unit where Sharman worked. Only authorized users, including nurses, could access a Pyxis using their fingerprints. As a nurse and

5

employee of the hospital with authorized access to the Pyxis, the defendant was in a position of trust with respect to the hospital, which gave her access to controlled substances via the secure medication system. She also held a position of trust with respect to her patients as a licensed medical provider with control over their care and all medications dispensed to them.

### The Hospital's Audit and Investigation

On April 20, 2018, a routine audit report of access to and utilization of controlled substances from the Pyxis machines for the month of March 2018 flagged Sharman's access as "red" for high fentanyl use and waste (disposal of excess fentanyl following physician-ordered patient administration). The audit for February 2018, completed in March, flagged Sharman's access as "yellow", also for high fentanyl usage and number of cancelled transactions (those transactions for which the authorized user opens the Pyxis to access the medication but then indicates the transaction is "cancelled" and closes the drawer). The hospital initiated an investigation of Sharman in April 2018. Review of the Pyxis access records showed a high number of "remove-cancel" transactions, indicating that the defendant had accessed controlled substances from Pyxis machine but then "cancelled" the transaction, returning the drug to the locked Pyxis. Review of video recorded from a surveillance camera positioned to view one of the Pyxis machines Sharman accessed in the Intensive Care Unit showed her entering the room with a basin or clipboard in her hand, removing something from the Pyxis, concealing it beneath the clipboard or in the basin and leaving. The video recording

6

also showed the defendant entering the medication room with a medication cassette (or cartridge) in hand and placing the medication cassette back into the Pyxis machine.

Sharman's last nursing shift at the hospital was on April 23, 2018. On April 25, 2018, after substantiating the tampering concerns flagged by the audit, Parker Adventist removed all fentanyl cassettes from the ICU, including all of those stored in the Pyxis machines on the floor and one cassette then in use on a patient.

On April 26, 2018, Parker Adventist employees interviewed Sharman. Sharman confessed to stealing controlled substances from the hospital, specifically fentanyl. Sharman told hospital employees that she took fentanyl from cassettes that she was going to administer to patients. She stated she withdrew ten to twenty micrograms at a time from a 100-microgram cassette, making sure that there was at least 70 micrograms in the cassette remaining for delivery to the patient. Sharman also stated that she sometimes took 30 to 40 milliliters of fentanyl from a cassette. She stated that she withdrew the drug from the cassette using a sterile syringe and saline flushes. Sharman stated that she kept the fentanyl in the syringe in her pocket and took it home. She stated she started this activity a couple of months earlier when she began experiencing financial difficulty, and that she had sold or intended to sell the drugs she stole. The hospital terminated Sharman's employment on April 26.

The Parker Police Department Interview

Following the hospital's interview on April 26, Parker Adventist contacted the Parker Police Department. Officers arrived at Parker Adventist Hospital, and Sharman consented to an interview. Sharman stated that she would take fentanyl from patients

who were on ventilators—those who were intubated and receiving mechanical ventilation to obtain oxygen because they could not breathe on their own. Sharman explained that she did this in two ways.

First, Sharman stated that she took the fentanyl from the cassette before placing the cassette in the medication pump that was on the patient. She stated she did this by using an empty, sterile "wasting" syringe to withdraw fentanyl from the port of the cassette. Sharman stated that she took approximately 10 to 20 micrograms when she did this. Sharman stated she would then use a sterile saline syringe to refill the fentanyl cassette so it would not appear that there was any drug missing. Sharman stated she would remove fentanyl from the cassettes either in the patient rooms or in an empty patient room on the same floor of the hospital before using the cassettes on patients. Sharman stated that she believed she did this approximately five to seven times.

Second, Sharman told the Parker Police Department that she would use the "cancel" function on the Pyxis machine to take the drugs. Sharman stated she would remove fentanyl from the Pyxis, take it to another room, withdraw a quantity of the drug using a sterile syringe, then replace the stolen drug with saline, before replacing the fentanyl cassette back in the Pyxis machine. She stated she sometimes did this by placing the fentanyl cassette inside a basin that she would cover with a clipboard to conceal her actions.

Sharman told the Parker Police officers that she never used the fentanyl she stole. She claimed, instead, that she stole fentanyl to make money, and that she sold it on a couple of occasions to an individual she met on Facebook. Sharman submitted to

8

a urine test for controlled substances at the conclusion of her interview with Parker Adventist Hospital and the Parker Police Department. Contrary to her assertions to the hospital and the police, the test results were positive for fentanyl. Sharman did not have a prescription for fentanyl at the time.

The FDA Interview and Federal Cooperation

On April 30, 2018, Sharman consented to an interview with special agents from the Food and Drug Administration, Office of Criminal Investigations. Sharman repeated that she took fentanyl from the hospital and sometimes tampered with the drug by adding saline to fentanyl cassettes after stealing the drug. She also falsely repeated that she did not take the fentanyl for personal use.

Sharman cooperated with the government by participating in a proffer in September 2018, at which time she provided additional information regarding the circumstances of the offense. Sharman's cooperation was important to assure full disclosure of the facts to law enforcement and the safety of potential victims.

Specific Instances of Tampering

As a consequence of Sharman's actions, Parker Adventist has identified and notified or attempted to notify twenty-nine patients who received fentanyl in the Intensive Care Unit between January 1, 2018, and April 25, 2018 (the date all fentanyl was removed from the unit), that those patients could have been affected by Sharman's actions. The hospital identified those patients based on records that identify that Sharman may have accessed the Pyxis drawer and pocket in which the medication that

ultimately was administered to the patient was stored. The hospital also identified those patients to whom Sharman had personally administered fentanyl.

Because the Pyxis system cannot identify which specific cassettes of fentanyl Sharman accessed, and because there is no record of which patients Sharman chose to divert fentanyl from when administering the drug, in most cases it is not possible to tell specifically whether these patients were affected based on those records.

In some cases, however, there is sufficient additional information to identify victims of the defendant's offense. On March 29, 2018, around 11:00 p.m., a nurse on duty in the ICU at Parker Adventist sought to obtain fentanyl to administer to her patient, N.H. This patient was ventilated and sedated with medication and was becoming agitated. The nurse discovered there was no fentanyl remaining in either of the two Pyxis machines in the unit. Sharman had withdrawn the last remaining fentanyl cassette from Pyxis machine 1 at 11:02 a.m. using the patient name L.R. A couple of hours earlier, Sharman had withdrawn all of the fentanyl from Pyxis machine 2. Responding to the other nurse's need for the medication for her patient, Sharman returned the fentanyl she had withdrawn for patient L.R. to the Pyxis so that the other nurse could withdraw it for use on her patient, N.H. Having withdrawn the fentanyl cassette the defendant provided, the other nurse loaded the cassette into the medication pump for patient N.H. The medication administration failed to alleviate the patient's pain, which was apparent as the patient became increasingly agitated. The doctor ordered an increase in the patient's fentanyl dose, first to the initially ordered limit, then again pursuant to a separate order from the doctor to increase that limit.

Nevertheless, the patient became increasingly agitated and was unresponsive to the fentanyl titration. The nurse withdrew the cassette that the defendant had returned to the Pyxis and administered a new cassette of fentanyl, which quickly alleviated the patient's agitation.

On April 23, 2019, at approximately 5:09 a.m., Sharman was on duty as a nurse in the ICU at Parker Adventist when she entered into the Pyxis machine that she was removing a fentanyl cassette for administration to patient L.L. At approximately that same time, however, video surveillance of this Pyxis machine shows the defendant enter the room with a fentanyl cassette in her hand, open the Pyxis, and place a cassette back into the Pyxis machine. Sharman does not remove any medication cassettes from the Pyxis at this time.

The Pyxis stored controlled substances in specific pockets inside specific drawers within the machine. Each pocket could hold multiple vials or cassettes of medication. Thus, for example, each pocket could hold multiple cassettes of fentanyl. When an authorized user accessed the Pyxis machine, the machine unlocked only the specific drawer and pocket that contained the medication being withdrawn. The Pyxis recorded each nurse or authorized health care provider's access to the drawer and pocket. On April 24, a different nurse accessed the same pocket and drawer of the Pyxis machine into which Sharman had placed the cassette on April 23 at approximately 5:09 a.m. The nurse took the last remaining cassette in that pocket for patient L.L.

The defendant was the only nurse who had accessed that specific drawer and pocket since the pharmacy department refilled that specific drawer and pocket from empty. The last access of the drawer was the instance at approximately 5:09 a.m. on April 23, when the defendant was seen placing a cassette back into the Pyxis machine. The nurse removed the cassette and inserted it into the medication pump for L.L. for administration at approximately 11:19 p.m. On April 26, this cassette remained in the patient's PCA when the hospital removed this cassette as part of its effort to collect all potentially tampered fentanyl from the Intensive Care Unit after learning of Sharman's actions. The FDA took possession of the cassette, and the FDA tested the contents. Test results from the FDA's Forensic Chemistry Center show that the contents were only 14% of the declared fentanyl concentration that should have been in the cassette. Thus, as charged in the Information, on April 23, 2018, Sharman tampered with a consumer product by opening the fentanyl container, removing fentanyl, and replacing it with saline.

In each of the foregoing instances, the fentanyl was in interstate commerce at the time the defendant tampered with it and placed it back into the Pyxis for use in patients. Each time Sharman removed fentanyl from the cassette and then returned it to the Pyxis or placed it for patient use, she affected interstate commerce. The fentanyl was a "consumer product" because it is a drug as defined in section 201 of the Federal Food, Drug, and Cosmetic Act. 18 U.S.C. § 1365(h)(1)(A).

The defendant knew the fentanyl in the Pyxis was to be used on patients, and when she tampered with it, she did so with reckless disregard for, and manifesting

12

extreme indifference to, the risk that another person would be placed in danger of bodily injury—that is, absence of pain relief and continued physical pain. See 18 U.S.C. § 1365(h)(4). Fentanyl is a powerful opiate that was used on the hospital's patients to treat pain. Administration of a substance other than the opiate, or a diluted dosage of the drug, prevents relief of serious pain to the patient. The patients who were receiving fentanyl in this instance were in the Intensive Care Unit, and many of them were incapacitated and ventilated. As such, the victims of the defendant's offense were unusually vulnerable due to their physical condition and inability to monitor, observe, be aware of, or stop the defendant's criminal conduct.

The Colorado State Board of Nursing issued a summary suspension of Sharman's nursing license on April 30, 2018. Sharman has not practiced as a nurse since that time.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by Title 18, United States Code, Section 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. The base guideline for Tampering with a Consumer Product is Section 2N1.1, with a base offense level of **25**.

B. The offense level should increase by two levels pursuant to Section 3A1.1(b)(1) because the defendant knew, or should have known, that a victim of the offense was a vulnerable victim.

C. The offense level should increase by two levels pursuant to Section 3B1.3, because the defendant abused a position of public trust, her position as nurse, and used a special skill, her training as a nurse and her nursing license, to commit and conceal the offense.

D. The adjusted offense level therefore should be **29**.

E. Pursuant to Section 3E1.1(a) and (b), and assuming continued acceptance of responsibility, the defendant should receive a three-level reduction for acceptance of responsibility. The resulting offense level is **26**.

F. The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

G. The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H. The advisory guideline range resulting from these calculations is **63 to 78 months**. However, in order to be as accurate as possible, with the criminal history

category undetermined at this time, the offense level estimated above could conceivably result in a range from 63 months (bottom of Category I) to 120 months (top of Category VI with the statutory cap of 10 years).

I.  Pursuant to guideline Section 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $25,000 to $250,000, plus applicable interest and penalties.

J.  Pursuant to guideline Section 5D1.2, if the Court imposes a term of supervised release, that term should be at least one year but not more than three years.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other Section 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all of the Section 3553 factors, to impose that reasonable sentence which

15

it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any Section 3553 factor.

## VII.  ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 6/24/19        *(signature)*
                     Jessica Sharman
                     Defendant

Date: 6/24/19        *(signature)*
                     Thomas Ward
                     Attorney for Defendant

Date: 6/24/19        *(signature)*
                     Anna Edgar
                     Assistant United States Attorney